So Ordered.

Dated: April 3, 2023



Beth E. Hanan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Brian E Beach and           Case No. 21-23346-beh
    Theresa A Winger-Beach,

          Debtors.           Chapter 7

    SLK Capital, LLC,

          Plaintiff,

v.                    Adv. No. 21-2103

    Brian E Beach,
    Theresa A Winger-Beach,
    Beach's Steaks & Spirits LLC,
    Louis D Reimer, and
    Mary Lou Reimer,

          Defendants.[1]

## DECISION AND ORDER FOR JUDGMENT

The plaintiff, SLK Capital, LLC ("SLK"), seeks a determination that debtor-defendants Brian Beach and Theresa A. Winger-Beach both owe it a debt based on a loan default by Mr. Beach and his business, Beach's Steaks &

---

[1] The Court maintains the original full caption, despite dismissing defendants Beach's Steak & Spirits, LLC, Louis Reimer, and Mary Lou Reimer from this action prior to trial. See ECF No. 19.

Spirits LLC, and that the debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). The loan default by Mr. Beach and his business was the subject of a state court action in Forest County, which was reduced to a judgment of $220,948.18 against those two defendants. Following a trial and consideration of the evidence, *see* ECF Nos. 70, 73, 74, the Court finds that SLK has not established that Theresa Winger Beach owes it a debt, and it has not sustained its burden to show, by a preponderance of the evidence, that the debt owed by debtor Brian Beach arose from a false written statement by which Mr. Beach intended to deceive the lender. Accordingly, the Court will grant judgment in favor of defendant-debtors.

## Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 1334 and the Eastern District of Wisconsin's July 16, 1984, order of reference entered under 28 U.S.C. § 157(a). Brian Beach concedes he owes a debt to SLK. Determining whether his debt is dischargeable is a core proceeding under 28 U.S.C. § 157(b)(2)(I), for which the Court may enter final judgment. 28 U.S.C. § 157(b)(1). Whether Theresa Winger Beach also is liable for the debt presents a question of state law.[2] This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

## Factual Findings

In April 2015, Brian Beach purchased a property located at 10139 Highway 8, Crandon, WI 54520 for $125,000.00, a mixed-use property that later became a restaurant and the debtors' homestead. ECF No. 65-13, at 6, 12-13. Mr. Beach funded the purchase with money from his mother, Mary Lou Reimer, and her husband, Louis Reimer. Shortly after the purchase, Mr. Beach and the business he owns, Beach's Steak & Spirits, LLC, applied for and obtained a series of loans from the plaintiff SLK. There is no evidence debtor had a prior relationship with SLK.

---

[2] The amended complaint refers to debtors Brian Beach and Theresa Winger-Beach collectively at times as "Beach" or "Debtor." That collective reference blurs the allegations lodged against each individual debtor and is a practice to be avoided.

During the process of applying for financing and consolidated financing in 2015 and 2016, Brian Beach and Theresa Winger told SLK that they would have the accountant for the business, Wayne Link, provide certain financial information to SLK. That information included a document titled *Beach's Steak & Spirits Source & Use of Funds* (undated), and *Beach's Steaks & Spirits LLC Balance Sheet*, dated November 30, 2015. ECF No. 65-2, at 20, 21 (also marked as part of trial exhibit 2). The debtors also provided SLK with a business plan, ECF No. 65-2, at 7-12, industry analysis, 65-2, at 6-14, detailed need for the funds, 65-2, at 15-17, and financial statements, 65-2, at 18-24. Both the *Source & Use of Funds* and the *Balance Sheet* listed for Year 1 a personal investment of $160,000, no private loans or real estate loans, an equipment loan of $20,000 and a bank line of credit for $20,000. ECF No. 65-2, at 20-21. Email communications between Mr. Link and SLK representative Ms. Joey Hansen show the *Source & Use of Funds* and the *Balance Sheet* were provided to SLK in August of 2015. ECF No. 65-4, at 1.

As part of the loan application process, Brian Beach described the backgrounds of key persons to work for the restaurant. He described his brother, Michael Roeper, as someone who had been employed in the food and beverage industry for almost 35 years, as a chef, executive chef, food and beverage director and general manager. ECF No. 65-2, at 3. Mr. Beach described his own background:

> Brian Beach started his restaurant experience at the age of thirteen (13), washing dishes at a local restaurant. Following in his brother Mikes footsteps, Brian worked his way up the ranks to Night Chef at the age of sixteen (16) with the Holiday Inn franchise. Knowing the restaurant business was in his blood, he worked the next thirty (30Chef, Kitchen Manager. Mr. Beach has worked at the Hartford Country Club, West Bend Country Club, Devil's Head Ski Resort and the Five Star rated, Fox & Hounds in Germantown WI. Some of Mr. Beach's achievements include feeding twelve hundred (1200), at the Wisconsin AA Convention and Pig Roast, and cooking a Cancer Benefit for one thousand five hundred (1500) at the Hartford Country Club. Brian also has extensive Bartending training, working at Wisconsin's largest indoor bar, The Mine Shaft in Hartford, Wisconsin. Mr. Beach's strengths are his ability to handle stressful situations, teaching and mentoring to those who also take pride in their job, his delicious preparations of a wide variety of food the many people who have followed him through his career as a remarkable Chef.

ECF No. 65-2, at 4.[3] The loan application also described the joint debtor's background:

> Theresa Winger, Brian's finance had a restaurant/banquet facility in Minocqua for three (3) years. Theresa managed the entire staff and establishment which seated 500 guests. Even though "Beach's Steaks & Spirits" is somewhat smaller, the same managerial skills are needed. With her ability to manage and teach professionalism along with proper etiquette, Theresa will be a great fit to "Beach's Steaks & Spirits."

ECF No. 65-2, at 5.[4]

To secure payment on each loan, Mr. Beach executed Unlimited and Continuing Guaranties of Payment, dated June 11, 2015, August 19, 2015, and December 21, 2015. ECF No. 61, at 1-2, ECF Nos. 65-3, at 12, 65-6, at 1, 65-8, at 7. SLK made the first loan to "Beach's Steaks & Sprits, LLC" (sic) on June 11, 2015, in the amount of $35,000. ECF No. 65-3, at 5. Mr. Beach signed that promissory note as Owner. SLK made a second loan to the business on August 19, 2015, for $25,000, ECF No. 65-5, at 5. Mr. Beach also signed that promissory note as Owner. SLK made its third loan to the business on December 21, 2015, for $20,000, with Mr. Beach signing the promissory note as Owner. ECF No. 65-8, at 5. On June 23, 2016, the SLK loans were consolidated into a $90,000[5] promissory note Brian Beach signed as Owner, and which reaffirmed the accuracy of the financial information previously supplied. ECF No. 61, at 2. Ms. Hansen of SLK testified that Beach's payments on the loan strengthened their relationship and induced SLK to lend more money and eventually to consolidate the notes.

---

[3] All typographical errors rendered as found in the original.
[4] Same treatment of typographical errors.
[5] While the three original loan amounts totaled $80,000, the consolidated promissory note listed the first loan amount as $45,000, not $35,000, so the total amount reflected in the consolidated promissory note was $90,000. If there was any error in the consolidated amount, it likely was resolved in the course of the state court judgment, a sum which far exceeded $90,000. That larger amount may have been due to the increased interest rate and responsibility for costs and fees of collection provided in the default terms of the consolidated note and guaranty. *See* ECF No. 65-9, at 1, 4; ECF No. 65-10, at 1.

The consolidated note states the loan would be in default upon the occurrence of one of the following events: (1) failure to make a timely monthly payment within three days of the applicable due date; (2) default in performance of any obligation or the breach of any of the representations, warranties, or covenants and failure to cure them within ten days; (3) insolvency of the borrower; (4) executing a general assignment for the benefit of creditors; (5) filing of a petition for bankruptcy, or seeking relief under any laws related thereto; (6) suspension of the operation of the business; or (7) default under the Security Agreement. ECF No. 65-9, at 2. The accompanying guaranty required Brian Beach to refrain from encumbering the restaurant's assets without SLK's consent. ECF No. 65-10, at 2.

In addition, each of the SLK loan documents signed by Brian Beach contain the following clause:

> Borrower represents and warrants to Holder that: . . . h) all of the financial statements, contracts and other written information which Borrower furnished to Holder prior to the date of the Note are accurate and complete in all material respects and fairly present in all material respects the financial condition and the results of operations of Borrower for the periods covered thereby and and as of the relevant dates thereof; and . . . Borrower does not have any knowledge of any material liability of any nature not disclosed in writing to Holder.

ECF Nos. 65-5, at 3, 65-8, at 3, 65-9, at 3. Theresa Winger did not sign any of the SLK loan documents. The $90,000 consolidated note to SLK matured on June 5, 2017. ECF No. 65-9, at 1.

Several weeks later, on June 27, 2017, Brian Beach executed a $160,000 mortgage in favor of his mother and stepfather securing the business property. The mortgage was recorded with the Forest County Register of Deeds. The "Attachment to Mortgage Deed" reads:

> This property was purchased by Brian E. Beach for $125,000. The purchase is set forth in a deed recorded April 7, 2015 as document number 216732. In addition to buying the real estate, Brian E. Beach also obtained $35,000 in startup money. This payment of $160,000 was made without obtaining a security interest in the real estate. The purpose of this mortgage is to provide a security interest in the real estate.
>
> This property cannot be sold without paying this mortgage in full. Should Brian E. Beach become the subject of a bankruptcy proceeding, or otherwise

insolvent, the mortgagee has the right to demand payment of the mortgage in full.

This mortgage must be paid in full when the mortgagee passes away.

The real estate description is set forth in the attached deed recorded April 7, 2015 as document number 216732.

ECF No. 65-13, at 11. Theresa Winger and Brian Beach married not long after, on July 15, 2017.

Mr. Beach's trial testimony was somewhat inconsistent as to whether the funds he accepted from the Reimers were a gift or a loan. On adverse examination he first responded affirmatively when asked whether he had borrowed the $160,000. He agreed that the *Balance Sheet* in Exhibit 2, ECF No. 65-2, at 21, did not mention that he had borrowed funds. He responded affirmatively when asked whether Exhibit 2, ECF No. 65-2, at 20, the *Source and Use of Funds* document, likewise did not mention that he had borrowed from the Reimers.

But as adverse questioning continued, Mr. Beach denied that the money from the Reimers was a "private loan," stating that his mother had given the money to him, not loaned it. When SLK counsel asked about Brian's earlier § 341 testimony which referenced a loan, he replied "I don't know how loan got in there." Brian continued, "it wasn't discussed as a loan, she just gave it to me." Later, when SLK's counsel asked, "at no time did you correct the misstatement?" Mr. Beach replied, "there was no loan, but true." ECF No. 72. The adverse exam continued:

> Q. To start the business you borrowed $160,000 from your mother Mary Reimer is that right?
> A.  She gave it to me, yes. . . .
> Q. You used the extra money from your mother beyond the $125,000 to pay for property and other business expenses, right?
> A. Right, yes.
> . . .
> Q. After you borrowed the $160,000 from your mother and you purchased the property in April 2015 you promptly sought additional sources of funding, true?
> A. True
> . . .

ECF No. 72. It is not clear from the above testimony if Mr. Beach is saying "true, I promptly sought additional sources of funding" or if he is affirming the other part of the question "after you borrowed the $160,000 from your mother," despite his characterization of it as a "gift" just two answers earlier.

SLK's counsel continued with questions about Theresa Winger's assistance in preparing documents for Beach's loan application to SLK:

> Q. You were not married to Theresa at the time, your intention was for her to play a major role in the business...true?
> A. True.
> . . .
> Q. Although you're the owner of the real estate in title she's always helped run the business generally with you as your equal, right?
> A. No, I wouldn't say that, I pretty much ran the show.
> Q. . . . [referring to Exhibit 1, an email from Brian Beach to Chuck Brys April 20, 2015] Theresa wrote the email?
> A. Yes she has computer knowledge I don't.
> Q. She was doing this with your authorization? . . . helping you and Theresa prepare financial statements to apply for additional financing with the lender? Additional emails follow, most with the signature of Theresa, she's working with SLK in August 2015 regarding financing?
> A. I believe so, yes.
> Q. Theresa is sending (this information) to Joey (Hansen) with your authorization on behalf of the business?
> Q. Yes it was all on me.
> . . .
> Q. (In this exhibit) Joey Hansen is writing to Wayne Link ...(says) Wayne Link is sending some information that had been requested, right?
> A. I don't follow. Now I (see it).
> Q. Theresa continues an email discussion with Joey Hansen of SLK regarding questions SLK had about what you did with the initial $35,000 SLK had lent earlier that year, right?
> A. I believe so, but I'm not seeing it.
> Q. Does this refresh your recollection that Theresa was working with Brys and Mr. Link to prepare financial documents to send to lenders including SLK?
> A. Theresa was authorized on my call.
> Q. She primarily dealt with SLK?
> A. She has computer knowledge.
> Q. She did the primary and direct discussions with SLK as well?
> A. Right.
> Q. You had essentially no recollection of direct communications with SLK?
> A. I talked to SLK a few times.
> Q. When documents had to be signed for SLK, you would go over them with Theresa, (and) she would get you to sign and send in to SLK?
> A. Right.
> Q. She always had responsibility to record financial information, right?

A. And (she) gives (the information) to accountant.
Q. And Theresa has always had general management authority with the business including ability to sign contracts for you from time to time, right?
A. On my approval, yes.
. . .

ECF No. 72. Then SLK counsel asked Mr. Beach whether he thought SLK would rely on the documents he authorized to be part of his loan application:

Q. You expected that SLK would rely upon the truth of the documents that you provided as reflected on Exhibit 2, true?
A. True.
Q. You knew if you revealed at the time that you had in fact borrowed all the money to purchase your business, that it would be a lot harder to convince any lender to loan you more money, true?
A. Ummm, I guess.
. . .
Q. In first page of Exhibit 2, middle of document says "Major price reduction allowed us to pay cash." See that?
A. Uh huh, yes.
Q. There's no mention here you borrowed the money from your mother, true?
A. No not in this. No.
Q. Turn to last 5 pages of document Exhibit 1, see document *Source and Use of Funds*? See that document?
A. Yes.
Q. Listed at top is personal investment $160,000, true?
A. Yes, true.
Q. Private loan, nothing, true?
A. True.
Q. Seller financing, nothing, true?
A. True.
Q. Real estate loan nothing, true?
A. True.
. . .
Q. You see halfway down same page says "plus depreciation"?
A. No I don't. Ok.
Q. Nowhere on this document does it indicate you borrowed money from your mother, true?
A. True.
Q. In fact, it says the opposite?
A. I don't know what you mean by the opposite.
. . . That's what it says here, but . . .
Q. That's false and inaccurate, right?
A. I wouldn't say that.
Q. They're materially inaccurate in that they deny the existence of any private loan, true?
A. No, I don't believe so.

Q. Where does it say you took out a private loan?
A. I didn't take out a private loan.
Q. What do you call what you did with your mother?
A. She gave it to me.
Q. It wasn't a loan?
A. It wasn't a loan. No.
. . .
Q. Do you recall testifying in this bankruptcy proceeding at a creditor's meeting?
A. Yes.
. . .
Q. And she (the Chapter 7 trustee) asked you when you had a loan with your mother and you answered when we purchased the restaurant?
A. But it was never a loan though.
Q. Did you sign a note in favor of your mother in 2015?
A. No, I never signed a note.
Q. But you testified you did?
A. I probably didn't understand.
Q. She then asked you how much you took out and you answered $160,000.
A. Well it was never discussed that it was a loan, she just gave it to me.
. . .
Q. Did you have a conversation with Theresa in 2015 about the money you got from your mother?
A. She knew about it, I don't know if I really understand the question.
Q. Did you tell Theresa you borrowed the money?
A. Yes.
Q. Even though you didn't borrow it you told her you did?
A. I don't remember that.
Q. Why would you do that if you didn't borrow it?
A. My mother gave me the money.
Q. So you wouldn't tell her you borrowed it?
A. No.
Q. She would have no reason to think the money was a loan not a gift?
A. She knew it was a gift all along.

ECF No. 72. Overall, Brian Beach's testimony is consistent that the money received from his mother was a gift, not a loan. Several times he has trouble understanding the questions, and he tried to correct what counsel told him his § 341 testimony was, concerning the use of the term "borrowed."

SLK counsel then sought to impeach Mr. Beach's credibility at trial by offering evidence of prior convictions. *See* Fed. R. Evid. 609. Mr. Beach acknowledged that in 1997 he was convicted of burglary, in 2002 of resisting/obstructing, in 2006 of felon in possession of a firearm and of armed robbery, and in 2012 of battery domestic violence. Debtors' counsel did not

object to this questioning. Yet nothing in the record shows that SLK gave debtors advance notice of his intent to ask Mr. Beach about any convictions. More important to the Court's ability to weigh this evidence, SLK failed to supply the Court with judgments or other filings setting out the particular elements of the crimes for which Mr. Beach was convicted.

Fed. R. Evid. 609, Impeachment by Evidence of a Criminal Conviction, provides:

> **(a) In General.** The following rules apply to attaching a witness' character for truthfulness by evidence of a criminal conviction:
> (2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving – or the witness' admitting – a dishonest act or false statement.
> (b) **Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness' conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
> (1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
> (2) the proponent gives an adverse party reasonable written notice of the intent
>
> to use it so that the party has a fair opportunity to contest its use.

Because debtors' counsel did not object, the Court accepts this evidence despite SLK's failure to provide the Court with judgments or criminal complaints describing the elements underlying the convictions. Nonetheless, the Court is mindful that all of the convictions acknowledged by Mr. Beach are older than 10 years, and without more, are not crimes of dishonesty. This evidence therefore is entitled to little weight.[6]

> Debtor's counsel then examined Mr. Beach:
> Q. Other than the (wire) transfers is there any paperwork regarding this money (from the Reimers)?
> A. No.
> Q. So he transfers $160,000 to you to buy the restaurant?
> A. Yes.
> . . .
> Q. Did you have to make monthly payments?

---

[6] *See, e.g., In re Cohen*, 334 B.R. 392 (Bankr. N.D. Ill. 2005) (noting, in 11 U.S.C. § 523(a)(2)(B) adversary proceeding summary judgment, dubious admissibility of evidence of debtor's twenty-year old conviction for felony insurance fraud).

> A. No.
> . . .
> Q. What did you plan on doing with the proceeds from the restaurant if you sold that property?
> A. Pay her back.
> Q. Why would you pay her back if you sold but not in any other situation?
> A. It was just the right thing to do.
> . . .
> Q. Who was the person that wanted this mortgage (Exhibit 13) signed?
> A. My brother Mike.
> Q. Why did he want it, if you know?
> A. I believe it was because I was getting married and he didn't approve of it.
> Q. Why did you sign the mortgage?
> A. I don't know why I did it, I was just asked by him to do it. I didn't at the time really understand what I was signing.
> . . .

ECF No. 72. Counsel also asked why Mr. Beach bought the restaurant property in 2015. He responded that he wanted to be in business for himself, for a change.

SLK counsel also called Theresa Winger-Beach adversely at trial. And, in the course of his questioning, he referred Ms. Winger-Beach to her prior deposition testimony in an effort to impeach her credibility.

Theresa acknowledged that she assisted Brian in obtaining financing from SLK. Then SLK counsel asked about her understanding of communications between Brian Beach and the Reimers about the nature of the funds he received from them:

> Q. You always understood the $160,000 received from Brian's mother was a loan?
> A. No.
> . . .
> Q. Turning to p. 26, l. 19 (of Theresa's May 24, 2022 deposition transcript, ECF No. 69) – "Q. As I've understood it, he always had a loan from his mom?
> A. Yes.
> Q. You knew that from the time he got the loan?
> A. Yes."
> Q. But today you deny it?
> A. I believe that day I also told you that you were using the word loan and it was not a loan when he got the money from his mother. He told me he got it, he did not say it was a loan. You were referring to it as a loan, sir.
> Q. Well, that's not what you said at that time in your testimony is it?
> A. This particular question, no. But if you went further into this you'll probably see what your court reporter recorded. How my answer was before I left that day.

. . .
Q. Do you recall that you acknowledged that they (financial documents supplied to SLK) were misleading because they did not show a loan?
 A. Yes, because it was not a loan.
Q. Why would they be misleading if it was not a loan? . . .  Go to p. 42, l. 1 (of deposition, ECF No. 69) … You were asked, "Q. So it was a private loan that he obtained for $160,000 from Mary and Lou Reimer to purchase the real estate, right? A. I guess. Q. So it's wrong what this document says when it says there was no private loan used to obtain the $160,000? A. I assume."
 . . .
Q. (referring to p. 43, line. 3 of ECF No. 69): "So this document, the way it's characterized with the $160,000 is inaccurate, true?
A. Apparently yes.
Q. And so whoever made this misrepresented those facts with regard to where those funds came from, true? A. I guess."
 . . .

ECF No. 72.

Debtors offered additional portions of Theresa's deposition questioning by SLK counsel as clarification[7]—pp. 53, l. 24 – 56, l. 9 of ECF No. 69—including:

"Q. Okay. And earlier you testified that you wouldn't have even, at one point you said that you always knew it was a loan and now you're saying that you don't know if it was a loan or a gift?
A. Well, the word loan is not, we were not looking, I was not being told it was a loan. I was being told that he was getting money from his mother and his stepfather, or his yeah, stepfather. The word loan was never used with Brian and my speaking.
Q. Well, Exhibit 2 shouldn't have said owner's contribution, it should have said either loan or contribution by owner's parents?
A. But –
Q. To be accurate?
A. But wouldn't it, yes.
Q. But it doesn't say that, right?
A. No.

---

[7] During the trial, debtors' counsel offered testimony from p. 54 of Theresa's deposition transcript, and in closing argument urged the Court to accept a slightly larger portion, pp. 53, l. 24 – 56, l. 9 for clarification, citing Fed. R. Evid. 106, the rule of completeness and applied to oral statements by Fed. R. Evid. 611(a). SLK counsel did not object to this request in his closing rebuttal. While the Court initially was unwilling to accept debtors' bare offer of Theresa's testimony from p. 54, on further consideration the Court will accept, and has recounted above, only those portions of Theresa's deposition testimony offered by debtors that are necessary to clarify the impeachment testimony offered by SLK. *See United States v. Lewis*, 641 F.3d 773, 785 (7th Cir. 2011) (describing the doctrine to require a "complete statement … when 'it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding. … The completeness doctrine does not, however, require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages.")(citations omitted).

Q. It represents that Brian Beach had the money without taking a loan because he contributed it as the owner, true?

A. True.

Q. And that's false, it's not what happened.

A. He got the money from his mother and his stepfather.

Q. So would you agree that this misrepresents the financial situation that led to the SLK loan that you were requesting in December of 2015 as shown on exhibit 4?

A. I don't think that anyone was misrepresenting anything.

Q. Well, you've already acknowledged Exhibit 2 misrepresented the circumstances of that contribution.

A. Because of the word loan that you're saying it needed to be up here where, where was that? I guess.

Q. What are you saying you guess? Now you see how this would be misleading to somebody?

A. I can see how it would be misleading, yes.

Q. You can understand why a lender putting $20,000 out there for your business would want to know if the owner had made a contribution of his own assets or had in fact borrowed the money so owed that to someone else?

A. Yes, but Brian did put his own money into it.

Q. How much?

A.  You would have to ask Brian, I don't remember.

Q. Certainly it wasn't –

A. I don't know that Brian would remember."

ECF No. 69.

The Court finds Theresa Beach's trial testimony was somewhat discredited via her prior inconsistent statement.[8] But the Court gives her earlier statement little persuasive weight, in part because it does not identify how she came to have personal knowledge, or "always understood" that Brian had a loan from his mother in the amount of "$165,000". Theresa's prior statement does not diminish the credibility of her trial testimony significantly, because it is not clear which part of counsel's deposition question Theresa was answering. Was she answering as to her understanding about the existence of a "loan" or as to the particular "$165,000" amount of some funds? Her responses to the next two questions do not overcome these problems and are

[8] Fed. R. Evid. 801(d)(1)(A) provides:

(d) Statements That Are Not Hearsay. A statement that meets the following conditions is not hearsay:

(1) A Declarant-Witness' Prior Statement. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

(A) is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition[.]

hardly statements of personal knowledge: "I guess" and "I would assume."
Likewise, her agreement with counsel's question that the financial statements
which did not acknowledge a private loan could be "misleading" seems more
likely to mean the statements could be confusing, not misleading, in light of
the full context of the questions asked and answers she gave.

SLK counsel also asked Theresa about her interaction with Ms. Hansen
at SLK:

> Q. You were also asked whether Joey Hansen at SLK, who was the person
> you were talking to about financing, true?
> A. Yes.
> Q. You never told her there was a loan, true?
> A. No.
> Q. And you acknowledge there was no way Joey Hansen or anyone at SLK
> would have known of the existence of this loan, true?
> A. No, and again it was not a loan.
> . . .

ECF No. 72.

When Ms. Hansen of SLK testified, she acknowledged that it was
important to SLK that Mr. Beach had invested $160,000 in his business,
noting that especially with small businesses SLK likes to see that the owners
have some "skin in the game" and some personal investment. She estimated
that SLK probably would not have loaned money to Beach and his business in
the first instance, or over the course of a year, if SLK had known that Beach
borrowed $160,000 from the Reimers. She went on to explain that SLK didn't
take a real estate mortgage on the restaurant property because the short term
note and personal guaranty included a prohibition against Beach encumbering
the property without first consulting SLK. In addition, her UCC check
confirmed there were no first position liens or mortgages on file. Given the
small amount SLK was lending, the SLK principals did not feel a mortgage was
necessary. Ms. Hansen also testified that even after the default date of June 5,
2017, SLK was willing to work with the borrowers, Brian Beach and his
business. ECF No. 72.

Ultimately, Brian Beach and his restaurant business defaulted on the
SLK loans. ECF No. 65-9, at 2. Several years later SLK filed a replevin action

against Mr. Beach and Beach's Steak and Spirits, LLC in Forest County Circuit Court, obtaining a stipulated judgment against both defendants. Case No. 2020CV00050. See ECF No. 43, Answer to Amended Complaint. Neither SLK nor Mr. Beach have supplied the Court with a copy of the state court complaint or the order for judgment, so the record lacks information as to the specific claim or claims alleged, the bases for the parties' stipulated judgment, and, if applicable, any allocation of the judgment amount between claims. Nonetheless, in the parties' joint pretrial report to this Court, Mr. Beach agreed that he stipulated to the entry of judgment against him and his business, jointly and severally, in the amount of $220,948.18, and neither in his answer to the amended complaint or elsewhere does he argue that a portion of that debt is not subject to the 11 U.S.C. § 523(a)(2)(B) analysis. ECF No. 61, at 2.[9]

On June 10, 2021, Mr. and Mrs. Beach filed a joint petition for relief under Chapter 7 of the Bankruptcy Code. Case No. 21-23346. Plaintiff SLK thereafter commenced this adversary proceeding, seeking a determination that the debt reflected by the state court judgment be excepted from discharge as to both debtors under 11 U.S.C. § 523(a)(2)(A) and (B), and § 727(a)(4).[10]

## Conclusions of Law

### I.      SLK Bears the Burden of Proof.

Plaintiff SLK contends that the stipulated judgment amount owed by Brian Beach and his business is not dischargeable under 11 U.S.C. § 523(a)(2)(B). SLK bears the burden of proving by a preponderance of the evidence that an exception to discharge applies. *See Grogan v. Garner,* 498 U.S. 279, 290 (1991). To meet that standard of proof, the "trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question." *Am.*

---

[9] SLK urges that the amount of the state court stipulated judgment has preclusive effect, citing *In re Pulvermacher*, 567 B.R. 881, 891 (Bankr. W.D. Wis. 2017), for the proposition that "a stipulated judgment including interest and attorneys' fees associated with original debt [is] preclusive and properly included as nondischargeable." ECF No. 70, at 4. Debtors here make no contrary argument. *See also Klingman v. Levinson*, 114 F.3d 620, 627 (7th Cir. 1997) (holding stipulation waived defense of issue preclusion.)
[10] The Court dismissed SLK's claims based on 11 U.S.C. §§ 727(a)(4) and 523(a)(2)(A). ECF No. 41.

*Grain Trimmers, Inc. v. Office Workers' Comp. Programs*, 181 F.3d 810, 817 (7th Cir. 1999). Courts construe exceptions to discharge strictly against the creditor and liberally in favor of the debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000) (citations omitted). This construction encompasses both policies of affording the honest but unfortunate debtor a fresh start, and of protecting his creditors from fraud.

## II. Requirements to Establish Nondischargeability under § 523(a)(2)(B).

Section 523(a)(2) of the Bankruptcy Code provides that

[a] discharge under section 727 ... does not discharge an individual debtor from any debt . . .
(2) for money, property, services or an extension, renewal or refinancing of credit to the extent obtained by –
. . .
(B) use of a statement in writing –
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

Accordingly, bankruptcy courts first determine, pursuant to § 523(a), whether there is a debt for money, property, services or financing of credit owed to the plaintiff creditor. If there is such a debt, the Court considers whether it is of a type that meets the elements of § 523(a)(2)(B) such that it should be excepted from discharge.

### A. Does Either Debtor Owe SLK a Debt?

SLK filed its amended complaint against both Brian Beach and Theresa Winger Beach.  The Court considers separately whether either debtor owes a debt to SLK. SLK's amended complaint alleged Theresa Winger Beach is jointly liable for a debt because, SLK contends, she had an ownership interest in the restaurant at the time the loans were made. ECF No. 36. SLK also argued that Theresa is equally liable with Brian because they both participated in preparing and submitting the loan documents to SLK. ECF No. 70, at 4. The debtors' answer to the complaint denies that Mrs. Beach is liable because the debt was

incurred before Theresa and Brian married, and Theresa is not an owner of the restaurant business. ECF No. 36, at ¶¶4-5.[11]

Whether Theresa is liable for a debt that could be deemed nondischargeable under 11 U.S.C. § 523(a)(2)(B) depends at first on Wisconsin law. SLK did not name Theresa as a defendant in its state court action, and thus there is no state court judgment deeming her liable to SLK. SLK presented no evidence of her having an ownership interest in the restaurant business, nor did it offer legal authority for this theory. Brian Beach's unchallenged testimony refutes that Theresa had an ownership interest, and his testimony that her acts on behalf of his business were under his control likewise was undisputed. Theresa did not sign any loan documents. Theresa's testimony corroborates that she acted under Brian's direction. In addition, Wis. Stat. § 183.0304(1) explains that debts incurred by an LLC are solely owed by the LLC. *Compare Bartenwerfer v. Buckley*, 598 U.S. __, 143 S. Ct. 665 (2023), holding that a partner's liability under California law for a debt fraudulently incurred by the partnership is nondischargeable under 11 U.S.C. § 523(a)(2)(A), even if the partner herself is innocent of the fraud. Accordingly, as there is no evidence that Theresa had an ownership interest in Beach's Steak and Spirits, LLC at the time SLK made the loans, and SLK has no state court judgment against Theresa, the Court finds that Theresa has no liability for the debt such that the Court should determine whether it is nondischargeable as to her.

As to whether Brian Beach owes SLK a debt of the type described in 11 U.S.C. § 523(a)(2), the parties agree the March 1, 2021, Forest County Circuit Court judgment against Mr. Beach and his restaurant in favor of SLK, totaling $220,948.18, is a debt Brian owes. ECF No. 61.

The Court next addresses the elements of 11 U.S.C. § 523(a)(2)(B) as they apply to debtor Brian Beach and the nature of the debt. This inquiry primarily asks the Court to weigh testimony and assess credibility as to what financial

---

[11] In their main bankruptcy case schedules, the debtors listed the SLK judgment as a marital debt. ECF No. 1, at 24 in Case No. 21-23346. That characterization does not affect the Court's analysis of whether Theresa is liable for a nondischargeable debt.

condition Brian represented to SLK at the time he sought financing, and what his intent was in making those representations. As stated, SLK must prevail by a preponderance of the evidence, tempered by the principle that to accomplish the "fresh start" policy of the Bankruptcy Code, such claims are viewed restrictively, with genuine doubts resolved in favor of the debtor. *See, e.g., Yankowitz Law Firm, P.C. v. Tashlitsky* (*In re Tashlitsky*), 492 B.R. 640, 644 (Bankr. E.D.N.Y. 2013).

**B. Statement in Writing.**

The first element of § 523(a)(2)(B) asks whether the debt Mr. Beach owes to SLK was obtained by use of a statement in writing. The parties do not dispute that Beach supplied SLK with a number of documents as part of his loan application(s) to support his business, including the *Balance Sheet* and *Source of Funds*. Brian Beach testified that he entrusted Theresa with "management responsibilities," which included preparation of the loan documents, "on [his] approval." "Written statements need not be physically prepared by a debtor to satisfy the writing requirement . . . [so long as they were] signed, adopted and used, or caused to be prepared by, the debtor." *Fairfax State Sav. Bank v. McCleary* (*In re McCleary*), 284 B.R. 876, 885 (Bankr. N.D. Iowa, 2002); citing *First Int'l Bank v. Kerbaugh* (*In re Kerbaugh*)*,* 162 B.R. 255, 262 (Bankr. D.N.D. 1993). Brian testified that he signed the notes and the guaranties to SLK, which affirmed the accuracy of the financial information previously supplied. Regardless of whether accountant Wayne Link prepared some of the documents for SLK, there is no dispute Link's work was done at the direction of debtors. The "statement in writing" element is satisfied.[12]

---

[12] Both debtors offered some testimony at trial that the accountant for the restaurant, Wayne Link, prepared some of the documentation submitted to SLK as part of the loan application. Brian did not testify that any of the material Link submitted to SLK was not approved by him, even if he did not see it before submission. Wayne Link did not testify.

**C. Statement Respecting Debtor's or an Insider's Financial Condition**.

Next, the Court must discern whether the statements are respecting the debtor's or an insider's financial condition. A statement is "respecting a debtor's financial condition" if "it has a direct relation to or impact on the debtor's overall financial status." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761, 201 L.Ed.2d 102 (2018) (explaining that a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is able to repay a given debt.). An "insider" is defined as a "corporation of which the debtor is a director, officer or person in control" 11 U.S.C. § 101(31).

Here, the two statements which are the focus of SLK's claim are not statements respecting Brian Beach's financial condition but are statements "respecting . . . an insider's financial condition." In other words, the *Source of Funds* and the *Balance Sheet* in Exhibit 2 reflect the condition of Beach's Steak & Spirits, LLC, of which there is no dispute Brian Beach is a director, officer or person in control. As such, the LLC meets the Code's definition of "insider." Akin to the statement in *Appling*, the entries on the *Source of Funds* and the *Balance Sheet* categorizing the $160,000 as paid-in capital/equity, and not as a personal loan, are facts that have a direct relation to or impact on the LLC's overall financial and solvency status. The entries on both documents, as endorsed by Brian Beach when he signed the promissory notes, thus are statements respecting a debtor's or an insider's financial condition, under 11 U.S.C. § 523(a)(2)(B)(ii).

**D. Creditor's Reasonable Reliance**.

The parties dispute whether SLK has established that the creditor reasonably relied on Brian's written statements, by a preponderance of the evidence. 11 U.S.C. § 523(a)(2)(B)(iii).

"[T]he concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective

debtors . . ." *In re Morris,* 223 F.3d at 554. But in some instances, a creditor's reliance may be unreasonable where there is reason to doubt the debtor's financial stability or there is no "attempt to ascertain [his/her] true financial condition . . ." *Id.* In making a determination of reasonableness, a court may consider, among other things, whether the parties had prior business dealings giving rise to a relationship of trust, whether there were red flags that would have alerted an ordinarily prudent lender to the possibility that the representations were not accurate, and whether even a minimal investigation would have disclosed the inaccuracy of the debtor's representations. *Eastern Sav. Bank v. Hansen* (*In re Hansen*), No. 14-96025, 2018 WL 1587538, at *24 (Bankr. N.D. Ill. March 28, 2018). As long as there is some attempt to ascertain financial condition, courts are unwilling to second-guess lending decisions, declining to cast a bankruptcy court as "an after-the-fact loan committee . . .". *Selfreliance Fed. Credit Union v. Harasymiw* (*Matter of Harasymiw*), 895 F.2d 1170, 1174 (7th Cir. 1990) (applying earlier clear and convincing evidentiary standard).

SLK asserts its reliance on the representations Beach made in the loan documents was reasonable because its loan officer, Ms. Hansen, viewed the inclusion of a $160,000 capital investment to mean (Beach and his business) had a personal stake in the success of the business. She also adequately explained that a mortgage in SLK's favor was unnecessary because, under the loan documents, SLK retained a primary position on the restaurant's real estate.

The debtors argue that SLK's reliance on the loan documents, without more, was not reasonable. They critique SLK for not inquiring as to the source of the $160,000 equity interest listed on the financial statements. They also argue that SLK should have sought certain other financial records from Mr. Beach, such as his bank statements or tax returns. ECF No. 73. Counsel for the Beaches also argued SLK has not shown the restaurant is insolvent, but insolvency is not an element under 11 U.S.C. § 523(a)(2)(B). Nonetheless,

courts have recognized that statements about a debtor's overall financial condition can help a creditor assess (or reasonably rely on) whether debtor (borrower) is solvent or insolvent, and thereby able to repay a given debt. *See Lamar, Archer*, 138 S. Ct. at 1761.

The Court credits Ms. Hansen's testimony on reliance. She deemed a mortgage to SLK unnecessary because the notes forbade Mr. Beach from encumbering the property without SLK's permission, a requirement debtors fail to acknowledge. Ms. Hansen also testified that Mr. Beach's payments on the SLK loans strengthened their relationship and induced SLK into lending him more money and eventually consolidating the notes. She testified that SLK "probably" would not have extended financing if it knew Beach and his business had a prior loan for $160,000. Overall, the Court finds SLK reasonably relied on the written representations regarding the financial condition of Brian Beach's business. Ms. Hansen's review of these documents and independent verification of the absence of liens via a UCC search is an investigation that meets the Seventh Circuit's standard for satisfying § 523(a)(2)(B)(iii). *See Morris*, 223 F.3d at 553-54.

**E. Material Falsity**.

A primary point of contention between the parties is whether the written statements are materially false because they did not disclose any personal loan and characterized the $160,000 as Brian's investment of capital into the business. Material falsity has been defined as an "important or substantial untruth." *Hopewell v. Stephens* (*In re Stephens*), No. 20-03706-JMC-7, 2021 WL 4465602, at *3 (Bankr. S.D. Ind. 2021) (citations omitted). In other words, a statement is materially false for purposes of § 523(a)(2)(B) if it "paints a substantially untruthful picture of a financial conditions [sic] by misrepresenting information of the type which would normally affect the decision to grant credit." *Stephens*, 2021 WL 4465602, at *3 (citations omitted).

Some courts have tried to distinguish between loans and gifts by considering whether there were any "hallmarks of a loan" attendant to the

funds. In *Weber v. Giarratano* (*In re Giarratano*), 299 B.R. 328, 334-45 (Bankr. D. Del. 2003), the court considered whether payments from a creditor to his girlfriend-employee were personal loans or gifts. The court looked to whether there was a deadline for repayment, a repayment schedule, or an interest rate attached to the funds, and whether there was a written agreement evidencing a loan. More recently, in *Organic Power LLC v. Small Business Administration* (*In re Organic Power, LLC*), 619 B.R. 540, 547-48 (Bankr. D.P.R. 2020), the court considered whether the Paycheck Protection Program should be treated as a loan or a grant program when there was no requirement of creditworthiness and repayment was not a significant aspect of the program. There, the SBA also urged the court to weigh certain hallmarks of a loan: presence of a promissory note, applicable interest rate, a maturity date, amortization terms, and an obligation to repay unless forgiven. *Id.*

Also critical for weighing the truth or falsity of the written statements under § 523(a)(2)(B)(i) is timing—the Court should assess whether Mr. Beach falsely characterized the $160,000 as paid-in capital/equity instead of as a loan at the time SLK was induced to lend money to him and his business. *See, e.g., Bombardier Cap. v. Rodi (In re Rodi)*, 163 B.R. 1017, 1023 (N.D. Ill. 1994) (finding written financial statement false, because when debtor submitted application for financing, he had an intent to convey his large interest in company to his wife and children which he failed to disclose to lender; also finding reckless disregard of the truth.)

To address falsity, SLK does not discuss whether there were repayment terms between Brian Beach and his parents, but instead focuses on portions of the debtors' testimony. SLK urges that it was false to characterize the $160,000 in the *Source of Funds* and *Balance Sheet* as paid-in capital/equity, and highlights instances where both Brian and Theresa have answered affirmatively counsel's questions using the term "loan" or "borrowed."

Conversely, the debtors point to other portions of their testimony. Mr. Beach testified, "She (his mother) gave it to me," and that Theresa Beach "knew

it was a gift." He concedes he may have testified at his July 2021 meeting of creditors that the money was loaned, but states he "probably didn't understand the question."[13] Mr. Beach points out that he had not undertaken any repayment of the $160,000, and there was no written agreement requiring him to do so. He never signed a promissory note in favor of the Reimers. Beach testified, nonetheless, that it would "be the right thing to do" for him to repay the Reimers in the event he sold the restaurant.

Considering all the relevant evidence and in light of the principle that courts construe exceptions to discharge strictly, the Court concludes that SLK has not established by a preponderance of the evidence that the two written statements listing the $160,000 as paid-in capital/equity were false at the time Beach submitted them. If Brian's sporadic accession to use of the word "borrowed" in compound questions put to him create some doubt as to the truth of the written statements, that doubt must be resolved in favor of the debtor. The majority of his testimony which insists the money was a gift, that he merely held a desire to repay his mother if he should sell the business, combined with the lack of any contemporaneous "hallmarks of a loan" sufficiently overcome that doubt.

### i. Unsupported or waived arguments.

Several other arguments raised in the closing argument do not alter the Court's conclusion on the element of material falsity. Debtors' counsel argues that "[o]nce the loan matured June 5, 2017 there could be no continuing agreement not to mortgage the property as of June 27, 2017," ECF No. 73, at 2, but misses the point. Even if the Court's inquiry was not focused on when the allegedly false statements were made, Ms. Hansen's undisputed testimony was

---

[13] The parties' exhibit list submitted before trial includes Exhibit 11, an unofficial transcript of Brian and Theresa's § 341 meeting of creditors. Both SLK and debtors agreed to its admissibility when they submitted copies of exhibits before trial, but, significantly, neither party offered it for admission during the trial. Consequently, it is not part of the record and the Court does not consider it. *See, e.g., Matter of Anchorage Boat Sales, Inc.*, 29 B.R. 275, 278 (Bankr. E.D. N.Y. 1983) (declining to consider a writing discussed in testimony, but not offered into evidence).

that she and SLK were willing to work with Brian Beach and his business after the maturity date. Her testimony supports the view that Beach's duties under the consolidated note and guaranty continued beyond the maturity date. Debtors offer no legal authority to the contrary.

Debtors' counsel's bare cite to *Edlin v. Soderstrom*, 83 Wis. 2d 58 (1978), *see* ECF No. 73, at 2, to characterize the Reimers' conveyance of funds to Brian as including a "right of first refusal" is undeveloped, and unsupported by debtor's testimony or legal authority. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.,* 845 F.3d 313, 321 (7th Cir. 2017) (citing *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). Counsel's right-of-first-refusal argument appears to rely only on the 2017 mortgage between Brian and the Reimers and fails to acknowledge the lack of documentary or testimonial evidence supporting such a characterization in 2015 when debtor submitted the *Source of Funds* and *Balance Sheet* to SLK. Even so, *Edlin* and its progeny address an opportunity to *buy*, not a claim on potential sale proceeds. "A right of first refusal is a contractual right to be first in line should the opportunity to purchase or lease a property arise." *Country Visions Cooperative v. Archer-Daniels Midland Co.*, 2021 WI 35, ¶ 22, 396 Wis. 2d 470, 958 N.W.2d 511 (citations omitted). There is no evidence whatsoever that the Reimers wanted the opportunity to buy the restaurant property. For these reasons, debtors have waived this argument.

Likewise, neither party argued that the money from Beach's mother was a contingent liability at the time she gave him the funds, and without deciding, it appears no testimony or documentary evidence would support such a conclusion. "A debt is contingent if either its existence or amount depends on some future event that may or may not occur." *Freeland v. Enodis Corp.*, 540 F.3d 721, 730 (7th Cir. 2008) (citing *In re Knight*, 55 F.3d 231, 236 (7th Cir.

1995).[14] Cases addressing a failure to disclose contingent debt consider, at least in part, the sophistication of the debtor, the available documentation evidencing the contingent debt, and the relative size or significance of the debt. *See, e.g., In re Horlbeck*, 589 B.R. 818, 843 (Bankr. N.D. Ill. 2018) (finding debtors' omission of $1.3 million contingent debt in promissory notes rendered the financial statement false). *See also*, *Union Planters v. Martin* (*In re Martin*), 299 B.R. 234 (Bankr. C.D. Ill. 2003), where the court found a cardiologist-businessman debtor's omission of $23 million in contingent liabilities, via personal guaranties, on loan application for $1.5 million loan to lease private plane to be a material misstatement. Plaintiff lender testified unequivocally that it would not have made the loan if it knew of the $23 million in personal guaranties. Here, given that the parties' testimony centers around whether the money from Brian Beach's mother was a gift or a loan in 2015 when Brian reported the amount as his investment on the *Balance Sheet* and *Source of Funds*, the Court need not *sua sponte* decide a possible alternative argument. Even so, there was no contemporaneous documentation evidencing a contingent debt, and as explained more fully below, Brian Beach is not a sophisticated debtor.

In sum, SLK has failed to establish by a preponderance of the evidence that the written statements were materially false.

### F. Intent to Deceive.

The parties also dispute whether SLK has proven the final element under 11 U.S.C. § 523(a)(2)(B)—intent. Intent to deceive may be inferred where a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan. *In re Hudgens*, 149 Fed. Appx. 480, 487, 2005 WL 2077288, at *6 (7th Cir. Aug. 26, 2005) (citations omitted). Whether to infer a debtor's intent to deceive is left to the

---

[14] Similarly, Wisconsin courts have refused to enforce illusory contracts. Contracts are illusory "when the contract is conditional on some fact or event that is wholly under the promisor's control and his or her bringing it about is left wholly to his or her own will and discretion." *Metropolitan Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 33, 291 Wis. 2d 393, 717 N.W.2d 58 (citations omitted).

discretion of the court. *Matter of Sheridan*, 57 F.3d 627, 634 (7th Cir. 1995). "[I]f there is room for an inference of honest intent, the issue of intent must be resolved in favor of the debtor." *Mega Marts, Inc. v. Trevisan* (*In re Trevisan*), 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003), citing *Rembert v. Citibank South Dakota, N.A.*, 219 B.R. 763, 767 (E.D. Mich. 1996), *aff'd*, 141 F.3d 277 (6th Cir. 1998). And, in the absence of a false statement, there can be no intent to defraud. *In re Cohen*, 334 B.R. 392, 399 (Bankr. N.D. Ill. 2005). But even assuming the statements in the *Source of Funds* and *Balance Sheet* describing $160,000 as paid-in capital/equity and no personal loans were false, the Court must consider Brian's intent or recklessness at the time he sought the SLK loan. *Martin*, 299 B.R. at 243 (explaining that an intent to deceive via material omissions must have arisen at the time of the transaction entered into by the parties.)

SLK argues that debtor had a motive to describe the funds from his mother as a gift or cash, and not as a loan, when applying to SLK for a loan. This portrayal, according to SLK, allowed him to state he purchased the restaurant real estate for cash and had no personal loans. SLK also contends that execution of the 2017 mortgage confirmed that the money wired from the Reimers to Brian Beach in 2015 was a loan all along. ECF No. 70, at 2-3. SLK urges that Mr. Beach admitted he never corrected any misstatements to SLK during the time he obtained multiple loans from that creditor, and by agreeing he never corrected any misstatements it means that *there were* misstatements. *Id.* at 4. In closing argument SLK cites a colloquy from Exhibit 11, an unofficial transcript of testimony Brian Beach gave at the 341 meeting of creditors. SLK then casts debtor's trial testimony, wherein he confesses to some confusion in his § 341 testimony, as simply a self-serving excuse.

The debtors respond that there was no intent to deceive, and that Mr. Beach didn't know "SLK required Mr. Beach to have earned the $160,000 himself." Counsel asserts there was "no pattern of purposeful conduct" and that "on this record SLK cannot prove debtor knew or should have known he

had to disclose the source of the $160,000." ECF No. 73, at 3-4. Beach's counsel also argues that the 2017 mortgage to the Reimers was not Brian Beach's idea, so he cannot have had fraudulent intent in 2015. Debtors' counsel asserts that "Brian Beach signed the mortgage . . . because his mother wanted him to," ECF No. 73, at 2, citing Exhibit 11, such that Brian could not have had an intent to deceive.

The parties' arguments pass each other by. SLK does not contend that debtors should have "disclosed the source of the $160,000" but instead argues that the money always was a loan that should have been disclosed, and not a gift of cash to Brian which he invested in the business. To the extent both parties rely on various excerpts from Exhibit 11, the Court does not consider those prior statements because the underlying exhibit is not part of the record. *See* n. 13, *supra*.

The Court finds Mr. Beach's testimony credible overall. At trial, Mr. Beach repeatedly denied that when the Reimers wired the $160,000 to him it was a loan. As noted earlier, the lack of a written promissory note or some other documentation of repayment terms or interest rates supports Brian's view that the money was his to use. While a debtor's mere "unsupported assertions of honest intent will not overcome the natural inferences from admitted facts," *Stephens*, 2021 WL 4465602, at *4 (citations omitted), the undisputed facts are that no hallmarks of a loan were present.

Mr. Beach's credibility is bolstered by other parts of the record. He later corrected his seeming acceptance of the word "borrowed" in one question SLK counsel posed to him. The record manifests that Mr. Beach is not a sophisticated debtor. His background, as described in Exhibit 2, ECF No. 65-2, at 4, is that he worked in restaurants from the time he was 16 years old onward, with no mention of whether he completed high school. He had never before owned a business. His answers to questions often demonstrated confusion. He admitted he didn't understand what he was signing in 2017 when he signed the mortgage in favor of the Reimers. *Compare, e.g., Moody National Bank v. Shurley*, No. 1:21-CV-1120-DAE, 2023 WL 2368023, at *6

(W.D. Tex. Feb. 1, 2023)(appeal pending) (affirming bankruptcy court's finding of no intent to deceive where debtors were unsophisticated, "having only one year of college between them" and held an honest if unreasonable belief that one loan would not conflict with loan from creditor-plaintiff); *Northern Trust Co. v. Garman* (*In re Garman*), 643 F.2d 1252, 1257 (7th Cir. 1980) (explaining that in determining debtor's knowledge or awareness of fraud, courts will scrutinize the acumen and experience of debtor.)

   The variation in Mr. Beach's testimony does not rise to the level of reckless or willful confusion and contradiction as found in other cases. *Compare, Buckeye Retirement Co. v. Hake* (*In re Hake*), 367 B.R. 490, 508-511 (Bankr. N.D. Ohio 2008) (assessing false oath claim under 11 U.S.C. § 727(a)(4)(A), where court found debtor's multiple characterizations and treatment of funds owed or credited to his son to have been willful manipulation of data, as opposed to unintended confusion). Indeed, the fact that Mr. Beach executed a mortgage in favor of his mother only in 2017 undercuts any intent to deceive in 2015.  Some courts have considered a debtor's conduct shortly after the false representation was made, *see, e.g., Bombardier Cap., Inc.*, 163 B.R. at 1024 (resisting debtor's argument that his intent to transfer his corporate interest was only 'inchoate' at the time he applied for financing, when debtor conveyed that interest within a month of obtaining the loan.). But here, the execution of the mortgage in 2017 appears to have arisen from 2017 considerations—the impending marriage of Brian and Theresa. There is no evidence, other than the superficial or later-corrected inconsistencies in Mr. Beach's testimony, that in 2015 and 2016 when he signed the SLK loan documents, Mr. Beach believed he had an enforceable repayment obligation to the Reimers but intended to conceal it. The fact that Mr. Beach held a desire to repay the Reimers if ever he was in a position to do so does not manifest an intent to deceive SLK. Nor was there evidence he had imminent plans to sell the restaurant after obtaining funds from SLK.

**Conclusion**

Even though the Court finds that the written representations to SLK were material and plaintiff's reliance on them was reasonable, the Court finds that debtor Brian Beach did not falsely represent $160,000 in funds given to him by his mother and stepfather as paid-in capital/equity and not a personal loan. In addition, the Court does not find Brian Beach intended, in 2015 and 2016, to deceive SLK into loaning him money, despite his thought that he might voluntarily repay those monies to his mother if he sold the restaurant. Accordingly, the Court ORDERS the debt owed by debtor Brian Beach to SLK Capital, LLC, totaling $220,948.18, is not excepted from discharge under 11 U.S.C. § 523(a)(2)(B). The Court also ORDERS that SLK's complaint against Theresa Winger-Beach is dismissed.